**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JOHN BROWN,

        Plaintiff,

                                     Case No. 3:13-cv-36-J-34PDB

vs.

BRYAN RIEDL, Warden of Reception
and Medical Center, in his individual and
official capacities, et al.,

        Defendants.

_____/

**O R D E R**

     **THIS CAUSE** is before the Court on Defendants' Motion for Summary Judgment (Doc. 114; Motion), filed on March 19, 2015.  In the Motion, Defendants move for entry of summary judgment on all claims pursuant to Rule 56, Federal Rules of Civil Procedure (Rule(s)).  See Motion at 1, 25.  Following a temporary stay of this case, Plaintiff John Brown (Brown) filed a response in opposition to the Motion on August 17, 2015.  See Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 138; Response); see also Order (Doc. 117) (staying case); Order (Doc. 132) (lifting stay).  Accordingly, this matter is ripe for review.

**I.**    **Procedural History**

     Brown initiated this action on January 11, 2013, by filing a two-count Complaint (Doc. 1) against Defendant Michael Crews, Secretary of the Florida Department of Corrections, in his official capacity (Crews), Kenneth S. Tucker, former Secretary of the Florida Department of Corrections, in his individual capacity (Tucker), Bryan Riedl, Warden

of Reception and Medical Center, in his individual and official capacities (Riedl), Ellen Link, Assistant Warden of Reception and Medical Center (Link), Sergeant Christopher Hancock (Hancock), Colonel Archie W. Clemons (Clemons), and Officer Hartley (Hartley).  See generally Complaint.

On April 4, 2014, Brown filed an Amended Complaint (Doc. 72) which dropped Tucker as a party to this action.  See Amended Complaint at 1-2.  In the Amended Complaint, Brown asserts a claim for violation of his Eighth and Fourteenth Amendment rights, pursuant to 42 U.S.C. § 1983, against Riedl, Link, Hancock, Clemons, and Hartley. Id. at 8.  Specifically, Brown alleges that these Defendants "through deliberate indifference, caused the Plaintiff to be exposed to high levels of friable asbestos and toxic chemicals, which posed an unreasonable risk of serious damage to the Plaintiff's health now and in the future." Id. ¶ 59.  In Count II of the Amended Complaint, Brown brings an additional § 1983 claim premised on supervisory liability against Crews and Riedl.  Id. at 9-12.  Brown alleges that Riedl and Crews condoned customs at the Reception and Medical Center and throughout the Florida Department of Corrections, involving: (1) the use of "seriously ill inmates" to work on "hazardous projects," and (2) the use of inmates to remove "asbestos-containing materials" from prison structures, and perform construction labor without protective equipment, proper tools, and with "inappropriate chemicals."  Id. ¶¶ 63-68. Brown demands compensatory and punitive damages, injunctive and declaratory relief, as well as attorney's fees and costs.  Id. at 8, 10-11.

On February 20, 2015, the Court entered an Order (Doc. 108) granting Defendants' Motion to Dismiss Plaintiff's Claims for Compensatory and Punitive Damages, and Motion to Dismiss Defendant Crews from this Action (Doc. 76).  In that Order, the Court dismissed

Brown's claim against Crews, and as such, Crews is no longer a party to this action.  See Order at 14.  In addition, the Court found that the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(3), precludes Brown from recovering compensatory or punitive damages based on the allegations contained in the Amended Complaint.  Id. at 8-11.  Thus, the Court dismissed Brown's claims for such relief as to both Counts.  Id. at 14.  Accordingly, this case proceeds solely as to Brown's claims for declaratory and injunctive relief.

In the instant Motion, Defendants request the entry of summary judgment in their favor as to all remaining claims.  See generally Motion.  Following the filing of the Motion, Brown discharged his attorney.  See Motion to Withdraw and for Stay (Doc. 115), filed March 19, 2015; Order (Doc. 117).  The Court then stayed the case for ninety days to allow Brown "to prepare himself for litigation or obtain new counsel."  See Order (Doc. 117) at 2; Order (Doc. 120).  Upon expiration of the ninety days, the Court lifted the stay, see Order (Doc. 132), and Brown, proceeding pro se, filed his Response to the Motion.  Brown has also submitted requests for the appointment of counsel, as well as for leave to amend the Amended Complaint, however, the Magistrate Judge denied these requests.  See Order (Doc. 131) (denying motion for appointment of counsel); Order (Doc. 148) (denying motion to amend complaint); Order (Doc. 150) (denying second motion to appoint counsel).

## II.    Standard of Review

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[1]   An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson,

---

[1] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged.  The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.  The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.   Background[2]

The events at issue in this lawsuit took place at the Reception and Medical Center (RMC), a correctional institution administered by the Florida Department of Corrections (DOC) in Lake Butler, Florida.  See Amended Complaint ¶ 10; Defendants' Answer, Defenses, and Demand for a Jury Trial (Doc. 112; Answer) ¶ 10.  "The RMC is designated to receive and process new inmates," as well as to provide primary medical care to ill and disabled inmates.  See Amended Complaint ¶ 11; Answer ¶ 11.  Due to health problems with his kidneys, Brown has been housed at the RMC since 2005.  See Motion, Ex. 1: Deposition of John Brown (Doc. 114-1; Brown Dep.) at 8.  Bryan Riedl served as the warden at the RMC from September of 2009, until May of 2013.  See Motion, Ex. S: Deposition of Brian Riedl (Doc. 114-19; Riedl Dep.) at 4-5.

At some point prior to June 24, 2009, the previous warden at the RMC noticed that the floor tiles in the F dormitory (F-Dorm) were loose and instructed Archie Clemons, a correctional officer colonel, to have the tile removed.  See Motion, Ex. B: Deposition of Archie Clemons (Doc. 114-2; Clemons Dep.) at 5, 24-25.  According to Clemons, the loose tiles posed a health and safety hazard in that someone could trip on a loose tile, or

---

[2]  As discussed above, because this case is before the Court on Defendants' motion for summary judgment, the facts recited herein and all reasonable inferences therefrom have been viewed in a light most favorable to Brown.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

potentially use a tile as a weapon.  Id. at 25-26.  As such, Clemons instructed Hartley, the dorm officer, to generate a work force to remove the tile.  Id. at 25-27; see also Motion, Ex. C: Deposition of Anita Hartley (Doc. 114-3; Hartley Dep.) at 8, 12-13.  Hartley then asked an inmate, Willie Jones, to put together a crew of inmates who could help with the tile removal project, and at Jones' request, Brown joined the crew.  See Hartley Dep. at 16; see also Brown Dep. at 25-26.

On June 24, 2009, Brown and the work crew began removing the tile flooring from the back half of the F-Dorm.  See Brown Dep. at 22, 44-46.  Hartley was the sole supervisor of the work crew during the tile removal project.  Id. at 26.  On each day of the project, Brown worked from approximately 9:00 a.m. to 11:00 a.m., and 1:00 p.m. to 4:00 p.m. removing tile from the floor of the dorm.[3]  See Brown Dep. at 23-25, 29.  According to Brown, the work crew used shovels, spades, and chisels to lift the tiles, as well as chemicals, such as bleach, oven cleaner, Comet, and "diamond sand off the rec yard," to remove the glue.  Id. at 16-17, 21.[4]  The work crew also used a water hose to "hose[] down a lot of the stuff," and a floor buffer.  See id. at 15, 21; Hartley Dep. at 20.  Although the inmates were not given any protective gear on the first day of the removal project, Brown is unaware of anyone expressing concern over the lack of protective equipment.  See Brown Dep. at 26-27.  On the second day, Hartley gave the inmates clear plastic gloves to use.  Id. at 30.

---

[3] Brown received dialysis from approximately 11:00 a.m. to 2:00 or 3:00 p.m. on Mondays, Wednesdays, and Fridays.  See Brown Dep. at 56-57.  As such, Brown would have missed some of the work hours when he was receiving dialysis.  Id.

[4] According to Hartley, the work crew used only water, bleach and floor stripper to remove the tile and glue.  See Hartley Dep. at 22.  Hartley denies that oven cleaner was used.  Id.  However, for purposes of the instant Motion, the Court accepts Brown's testimony that the inmates used oven cleaner and other chemicals during the tile removal project.

In removing the tile, the work crew tried "to get up under the tile because they were trying to save every tile . . . keep them from getting busted up." Id. at 17.  However, some of the tile would break during the removal process. Id. at 17, 22.  Under the tile was a type of glue, called mastic, that the inmates also removed from the concrete floor using the same tools. Id. at 17-18.  After removing the tile and mastic, the inmates ran a buffer over the concrete floor and used "chemicals" to clean it up "as best [they] can." Id. at 19.  The work crew completed this portion of the tile removal project on approximately June 29, 2009.  See Amended Complaint ¶ 22; Answer ¶ 22; see Brown Dep. at 36-37.[5]  Because the work crew did not work on weekends, see Brown Dep. at 36, it appears that this portion of the project took approximately four work-days.

In late October of 2009, Brown and others commenced the tile removal project on the front half of the F-Dorm.  See Brown Dep. at 42-45.  The inmates worked the same hours as in June, and this phase of the project lasted approximately two or three days. See id. at 43, 45-46, 49.[6]  Once again, according to Brown, plastic gloves were the only protective equipment provided to the work crew.  Id. at 44.  On Thursday, October 22, 2009, Hancock, who was the environmental health and safety officer at the time, observed the work site and ordered a work stoppage because the inmates were not wearing the

---

[5] Although the Amended Complaint identifies the last day of the project as June 28, 2009, see Amended Complaint ¶ 22, Brown explains that the work crew did not work on weekends, such that the date should actually be the next work day, see Brown Dep. at 36-37.  Because June 28, 2009, was a Sunday, the Court infers that the project ended on June 29, 2009.

[6] The F-Dorm has small "slat windows that roll in and out" all the way around the building which, according to Hartley, were open during the project.  See Hartley Dep. at 26-27.  In addition, the F-Dorm has four big wall fans on each side used to circulate air, as well as exhaust fans in the ceiling. Id. at 25-26.  Hartley recalls that the exhaust fans "were on all the time during the day." Id. at 26.  Nonetheless, based on his "personal knowledge," Brown contends that only two of the eight fans in the F-Dorm were operational at the time, and at one point during the project, the windows were closed because of a cold-spell.  See Brown Dep. at 71-72.

necessary personal protection equipment, such as boots and glasses. <u>See</u> Motion, Ex. D: Deposition of Christopher S. Hancock (Doc. 114-4; Hancock Dep.) at 11, 24-26, 47. Hancock does not remember specifically what he said to Hartley, only that he told her to stop because the inmates were not wearing proper shoes or safety glasses. <u>Id.</u> at 26. Hancock recalls that he may have "mentioned something about the tile, that the facility being older, might have asbestos." <u>Id.</u> According to Hancock, he was only speculating as to the possibility of asbestos, "a shot in the dark," in an attempt to overemphasize the importance of getting the work crew the protective gear they needed.[7] <u>Id.</u> at 34-35. However, Hancock was only at the site for "a minute or two" because soon after his arrival he was called away to help with an officer having an asthma attack. <u>See</u> Hancock Dep. at 26-27. While he was waiting to go to the hospital with that officer, Hancock told Riedl about the situation in the F-Dorm, and that he had instructed them to stop working, but may or may not have said anything about the potential asbestos issue. <u>Id.</u> at 31-34.

According to Clemons, Hartley informed him of the work stoppage, and he instructed her to get the protective gear the inmates needed, i.e., boots, masks, gloves, and put the crew back to work. <u>See</u> Clemons Dep. at 30-31. Clemons testifies that Hartley did not express to him any concern regarding asbestos, and Clemons did not speak with Hancock or Riedl about the issue. <u>Id.</u> at 31-33. Pursuant to Clemons' order, Hartley resumed the work on the project two or three hours after the stoppage.[8] <u>See</u> Hartley Dep. at 18. Hartley recalls that the inmates finished the project that same day. <u>Id.</u> at 20. However, Brown

---

[7] Hartley states that Hancock did not tell her why he ordered the work stoppage and she first learned of the potential concern with asbestos only later "[w]hen the project was stopped and the inmates were moved out of the dorm." <u>See</u> Hartley Dep. at 17-18, 23-24.

[8] The evidence of record does not indicate whether Hartley provided the inmates with protective gear at that point. <u>See</u> Brown Dep. at 48-49; Hartley Dep. at 18-20.

testifies that they continued working the following day until Hancock returned, stopped the project again, and evacuated the building.  See Brown Dep. at 48-49.  According to Brown, the work crew never completed the project on the second half of the F-Dorm.  Id. at 45. Hancock does not remember returning to the work site on Friday, but instead testifies that he visited the work site on Monday, October 26, 2009, and discovered that the work crew had completed the tile removal project.  See Hancock Dep. at 34, 46.

Upon discovering that the project had been completed, Hancock sent an email to Riedl regarding the health and safety hazards he had observed, including the presence of asbestos in the tile and mastic.  See Hancock Dep. at 36-37, 42; see also Amended Complaint, Ex. A.  At that time, rather than mere speculation, Hancock actually had a "pretty good" guess that the tile and mastic contained asbestos because, just prior to emailing Riedl, Hancock learned that asbestos had previously been found in the C dormitory (C-Dorm).  See Hancock Dep. at 43-45.  Specifically, on Monday morning, Glenn Williams, the maintenance supervisor, gave Hancock test results dated March 21, 2008, which showed the presence of asbestos in the mastic adhering the tile to the floor in the C-Dorm. See id. at 44; Motion, Ex. P.  Based on those tests results, Hancock "had a good indication that, [since] the dormitories been built at roughly the same time, if it was in C dorm, it probably was in F dorm at that time."  See Hancock Dep. at 45.  On Tuesday or Wednesday, Hancock called Riedl about the issue, and Riedl instructed him to consult with the Region II safety coordinator, who told him to contact the Department of Environmental Protection (DEP), and the Region II medical administrator.  See id. at 49-50; Riedl Dep. at 17.  Those authorities "gave the advice that [the RMC] have the area tested" and that they "immediately remove the inmates from the . . . dormitory."  See Riedl Dep. at 18; see also

Hancock Dep. at 50-51; Motion, Ex. E.  Accordingly, Riedl promptly ordered the inmates removed from the F-Dorm, see Riedl Dep. at 35-36, and the inmates were evacuated that same day.  See Hancock Dep. at 49, 59; Motion, Ex. O.

On October 29, 2009, after the inmates were evacuated, Mihir Environics, Inc. came to the RMC to perform asbestos testing.  See Hancock Dep. at 54, 59; see Motion, Exs. G-H.  Mihir Environics tested air samples in all four dorms, as well as tile and mastic from the F-Dorm.  See Motion, Exs. G-H.  On November 1, 2009, John DeLoach of Mihir Environics reported that all of the collected air samples, in each dorm, "were determined to be less than 0.01 fibers per cubic centimeter of air (f/cc) at the time the air was sampled."  See Motion, Ex. G.  Based on these results, Mihir Environics found that: "All air samples results were reported as below detection limit and did not suggest asbestos exposure at this time." See id., Ex. I, Ex. F: Deposition of John DeLoach (Doc. 114-6; DeLoach Dep.) at 14.[9]  In addition, Mihir Environics found that the floor tile and floor mastic in the F-Dorm tested positive for asbestos.  See Motion, Ex. H at 1.  The laboratory analysis report found that the tile and mastic contained between four and seven percent asbestos fibers.  Id., Ex. H at 2.  Pursuant to these findings, Ajay Thakkar of Mihir Environics advised that the "[d]orms can be reoccupied after installation of new floor tile over the existing floor with asbestos containing mastic or existing floor tile."  Id., Ex. L.  Thakkar further recommended that "[d]uring installation of the new flooring do not sand the floor with existing asbestos containing mastic or do not damage the existing asbestos containing floor tile."  Id. Pursuant to this recommendation, with which the DEP agreed, the RMC "eventually

---

[9]  Brown appears to challenge the validity of these findings given that the windows were open and fans operating in the days leading up to the test.  See Brown Dep. at 75.

encapsulated the actual flooring, the leftover mastic and the concrete," by putting "new tile over the concrete and mastic." See Hancock Dep. at 59, 67-68; see also Motion, Ex. O.

After the tile removal project, several inmates, including Brown, filed grievances regarding their exposure to asbestos. See Brown Dep. at 77. Although Hancock initially responded to a few of these grievances, he was advised that a different office would handle the matter, see Hancock Dep. at 60, and Link, the assistant warden of programs, addressed the grievances. See Riedl Dep. at 31. However, the RMC waited to respond to the grievances with an approved standard response, issued by the DOC's central office of safety, and as such, the grievances were not answered within the required ten-day time frame. Id. at 40-43; see also Brown Dep. at 77-78; Amended Complaint, Ex. B. A month or two after the tile removal project, the inmates who were exposed to asbestos received chest x-rays. See Brown Dep. at 41-42, 51-52; Hancock Dep. at 63. Brown's chest x-ray revealed a spot on his lung which was diagnosed as cancer. See Brown Dep. at 41-42, 52. Brown had lung surgery in 2011 related to the cancer and half of his left lung was removed. Id. at 80. At the time of his deposition, Brown believed himself to be cancer-free. Id. at 81.

On August 28, 2014, at Defendants' request, Michael K. Varner, a licensed asbestos consultant with Southern Earth Sciences, Inc., prepared a report concerning Brown's exposure to asbestos. See Motion, Ex. R (Doc. 114-18; Varner Report). Varner opines that "[t]here is a dose/response relationship between exposure [to asbestos] and an asbestos related disease," and as such, "most asbestos related diseases occur in workers . . . who have worked with raw or manufactured asbestos with high exposures and little or no protection for extended periods." Id. at 3. Accordingly, Varner explains that "it is less

likely that exposure to asbestos for a period of six (6) days, as stated in the [A]mended [C]omplaint, will result in the development of an asbestos related ailment." Id.  Varner concludes that "the exposure to asbestos by [Brown] was low and there is a low probability of [Brown] developing an asbestos related disease." Id. at 4.  Varner reaches this conclusion based on the following factors: (1) "[w]et methods were used during removal of floor tile and mastic," which inhibited the asbestos fibers from becoming airborne; (2) the floor tile and mastic were easy to remove, with little or no breakage, also inhibiting asbestos fibers from becoming airborne; (3) the floor tile and mastic were "non-friable" materials, "bound in a matrix of vinyl or tar making release of the fibers to the air difficult," (4) air was circulated during the removal operation and the time frame was limited, and (5) limited personal protective equipment was used by workers during removal operations. Id. at 3-4.  Varner also opines that asbestos-related diseases do not develop immediately after exposure, and that the latency period for lung cancer is ten to thirty years. Id. at 3.

IV.  **Discussion**

   A.  **Deliberate Indifference**

   "[S]ection 1983 provides individuals with a federal remedy for the deprivation of rights, privileges, or immunities protected by the Constitution or the laws of the United States that are committed under color of state law." Brown v. City of Huntsville, Ala., 608 F.3d 724, 733 n.12 (11th Cir. 2010) (citation omitted); see 42 U.S.C. § 1983.  Thus, to state a claim for relief under § 1983, a plaintiff must sufficiently allege that he or she was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." See Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1276-77 (11th Cir. 2003) (quotation

omitted).  Here, Brown alleges that Defendants violated his Eighth Amendment rights by subjecting him to cruel and unusual punishment in the form of exposure to asbestos and toxic chemicals.  See Amended Complaint ¶¶ 57-59.

A prisoner's medical treatment and conditions of confinement are subject to scrutiny under the Eighth Amendment.  Helling v. McKinney, 509 U.S. 25, 31 (1993).  Indeed, the Eighth Amendment's prohibition against cruel and unusual punishment requires that prisoners be provided "humane conditions of confinement," including adequate food, shelter, clothing, and medical care.  Herman v. Holiday, 238 F.3d 660, 664 (5th Cir. 2001) (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994)).  It further imposes a duty upon prison officials to "take reasonable measures to guarantee the safety of inmates."  Farmer, 511 U.S. at 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).  Thus, an inmate may maintain a cause of action under the Eighth Amendment challenging the conditions of his confinement.  Evans v. St. Lucie Cnty. Jail, 448 F. App'x 971, 973 (11th Cir. 2011).

To establish such a claim, a prisoner must show that the challenged condition is "extreme," generally involving "the wanton and unnecessary infliction of pain," or that the condition poses "'an unreasonable risk of serious damage to his future health' or safety." Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004) (internal citations omitted).  This showing involves both an objective and a subjective component, that is: "an objective showing of a deprivation or injury that is 'sufficiently serious' to constitute a denial of the 'minimal civilized measure of life's necessities' and a subjective showing that the official had a 'sufficiently culpable state of mind.'"  Thomas v. Bryant, 614 F.3d 1288, 1304 (11th Cir. 2010) (quoting Farmer, 511 U.S. at 834).  As to the official's state of mind, the relevant standard is "deliberate indifference."  Helling, 509 U.S. at 32.  The Eleventh Circuit has

explained that "'deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.'" Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003) (quoting McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)). In addition to these requirements, a plaintiff must also allege causation. See Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007) ("[A]s with any tort claim, [the plaintiff] must show that the injury was caused by the defendant's wrongful conduct.").[10]

In accordance with the foregoing, the Court first considers the objective component of Brown's claim, specifically, whether the circumstances of the tile removal project exposed Brown to "an unreasonable risk of serious damage to his future health or safety." See Moore v. Faurquire, 595 F. App'x 968, 973 (11th Cir. 2014). This factor includes both "a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure" to asbestos and chemicals, and an assessment of "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." See Helling, 509 U.S. at 36. Here, the evidence shows

---

[10] A plaintiff may also establish an Eighth Amendment violation based on a prison official's deliberate indifference to a prisoner's serious medical need. See Evans, 448 F. App'x at 973-74. "[A] serious medical need is considered one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow, 320 F.3d at 1243 (internal quotation omitted). Notably, in Powell v. Lennon, the Eleventh Circuit found that, where an inmate was forced to live in a dormitory atmosphere filled with friable asbestos, his demand to be placed in an asbestos-free environment was a serious medical need, and ignoring this request was deliberate indifference. See Powell, 914 F.2d 1459, 1462, 1464 & n.10 (11th Cir. 1990). Thereafter, the Supreme Court decided Helling, and thus, more recent cases analyze a prisoner's exposure to environmental toxins using the conditions of confinement framework discussed in that decision. See Helling, 909 U.S. at 31-35; see also, e.g., Harris v. Donald, 266 F. App'x 804, 808 (11th Cir. 2008); Moore v. Faurquire, 595 F. App'x 968, 972-73 (11th Cir. 2014). As such, the Court finds it appropriate to apply that analysis to this case as well. Regardless, whether one characterizes Brown's claim as "inhuman conditions of confinement, failure to attend to his medical needs, or a combination of both," the deliberate indifference standard applies and the outcome of this case is the same. See Helling, 909 U.S. at 32.

that for a period of approximately seven days, for no more than five hours a day, Brown worked to remove floor tile and mastic that contained non-friable asbestos fibers. <u>See</u> <u>supra</u> pp. 6-7; <u>see also</u> Varner Report at 2-3.  In addition, for purposes of the instant Motion, the Court accepts Brown's testimony that he used various chemicals, including oven cleaner, to remove the floor tiles and mastic. <u>See</u> Brown Dep. at 21.  The work crew also used water, bleach, and floor stripper to loosen the tiles and endeavored to remove the tiles without breaking them, although some tiles did break. <u>Id.</u> at 16-17, 21, 70.  Aside from plastic gloves, Brown did not wear any protective gear during this project. <u>Id.</u> at 30, 33, 44. In addition, viewing the evidence in the light most favorable to Brown, the Court accepts that, for at least a portion of the project, the windows in the F-Dorm were closed and some of the fans were not operating. <u>Id.</u> at 71-72.  However, while this evidence demonstrates that Brown was exposed, without protection, to asbestos and chemicals, it does not address whether this exposure poses a grave risk to his future health. <u>See</u> <u>Harris v.</u> <u>Donald</u>, 266 F. App'x 804, 808 (11th Cir. 2008).  Indeed, the record contains no evidence from which a reasonable juror could conclude that Brown's limited exposure to asbestos and chemicals, under the circumstances of this case, constitutes an unreasonable risk of serious damage to his future health. <u>See</u> <u>Moore</u>, 595 F. App'x at 973.

Moreover, Defendants submit evidence that, at least with respect to his exposure to asbestos, the probability of Brown developing a related disease is low. <u>See</u> Varner Report at 4.  According to Varner, the likelihood that an individual will develop an asbestos-related disease increases based on the extent of his or her exposure to asbestos, such that the lower the exposure, the less likely an asbestos-related ailment will result. <u>See id.</u> at 3, 4. As stated above, Brown was exposed to asbestos for a very limited period of time.

Moreover, the circumstances of the tile removal project are such that, despite the presence of asbestos in the tile and mastic, Brown's actual exposure to asbestos was itself low.  Id. at 3-4.  Specifically, aside from incidental breakage, the tile was removed intact, using wet techniques, factors which assist in preventing asbestos fibers from becoming airborne. See Brown Dep. at 16-17, 21; Varner Report at 3.  In addition, the work took place in a facility with the windows open, at least part of the time, and two fans operating, which also assisted in circulating air and lowering the exposure to the workers.  See Brown Dep. at 71-72; Varner Report at 3.  Moreover, the floor tile and mastic were "non-friable" materials, meaning they cannot be "pulverized, crumbled or reduced to powder by hand pressure," decreasing the likelihood of air-borne asbestos exposure.  See Varner Report at 2-3. Indeed, the asbestos fibers were bound within the tar and vinyl making release into the air difficult.  See id. at 3.  As such, the evidence before the Court indicates that, under the circumstances, Brown's actual exposure to asbestos was limited and did not significantly endanger his health.[11]  Id. at 4.  In the Response, Brown fails to point to any evidence that the tile removal project exposed him to levels of asbestos or chemicals that pose an unreasonable risk of serious damage to his health.  Thus, the Court finds that Brown has failed to create a genuine issue of material fact as to whether his claim satisfies the objective component of his Eighth Amendment claim.  See Helling, 509 U.S. at 35-36;

---

[11] The Court notes that Brown offers no evidence that the chemical or asbestos exposure caused any health problems for him.  See Moore, 595 F. App'x at 973 & n.6 ("While causation is a separate element of [plaintiff's] deliberate indifference claim, the issue of whether his exposure to paint stripper likely could cause health problems also comes into play as to the objective component of his claim." (internal citation omitted)); Kelley v. Hicks, 400 F.3d 1282, 1285 (11th Cir. 2005).  Although Brown testified that a chest x-ray conducted "a month or two later" revealed the presence of a cancerous spot on his lung, see Brown Dep. at 41-42, 51-52, there is no evidence in the record linking Brown's lung cancer to the exposure.  Moreover, the only expert testimony of record indicates that "[d]evelopment of an asbestos related disease does not occur immediately after exposure," and that "in general, the latency periods for lung cancer is 10 to 30 years . . . ."  See Varner Report at 3.  In light of this evidence, it appears unlikely that Brown's lung cancer, detected within months of the exposure, was causally related to the asbestos.

Moore, 595 F. App'x at 973 (finding prisoner's Eighth Amendment rights were not violated in the absence of any evidence that applying a paint stripper with only a face shield for one week caused a substantial risk of serious harm to his health or safety); Harris, 266 F. App'x at 807-08 (affirming summary judgment for defendants where record contained no evidence that prisoner was subjected to prolonged exposure to dangerous levels of asbestos and medical expert opined that given limited exposure, prisoner's likelihood of developing an asbestos-related disease was less than one percent); see also Morefield v. Brewton, 442 F. App'x 425, 427 (11th Cir. 2011) (affirming summary judgment for defendants where prisoner "has not shown that he was exposed to sufficiently 'grave' levels of [environmental tobacco smoke] to constitute a violation of the Eighth Amendment"); Kelley v. Hicks, 400 F.3d 1282, 1284 (11th Cir. 2005) (same).

In addition, even if Brown could satisfy the objective component, he would fail on the subjective component of the analysis because he has not identified a genuine issue of material fact as to whether any Defendant was deliberately indifferent to the risk of harm. The record contains no evidence that prior to the start of the tile removal project any Defendant was aware of the presence of asbestos in the F-Dorm.  Hancock first identified the potential issue with asbestos on October 22, 2009, but rather than disregard the risk, he immediately instructed Hartley to suspend the project.  See Hancock Dep. at 26, 34-35. Although Clemons ordered the work to resume, he was unaware of the asbestos risk.  See Clemons Dep. at 31.  With respect to Hartley, Hancock may or may not have mentioned the possibility of asbestos to her, see Hancock Dep. at 26, 34-35, but she denies any knowledge of a concern with asbestos, see Hartley Dep. at 23-24.  Regardless, even if Hancock did mention that asbestos may be present in the F-Dorm, there is no evidence to

suggest that Hartley subjectively understood from Hancock's "shot in the dark" speculation that continuing the tile removal project actually presented a serious risk of harm to the inmates.  See Farmer, 511 U.S. at 837 ("[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").  Likewise, while Hancock may or may not have mentioned his concern with potential asbestos exposure to Riedl that day, see Hancock Dep. at 33-34, he told Riedl that he had suspended the project and there is no evidence that Riedl knew that the inmates had resumed working.  See Hancock Dep. at 31, 34.

Significantly, although asbestos had previously been detected in the C-Dorm, the test was performed on March 19, 2008, see Motion, Ex. P, over a year before Riedl became the warden, see Riedl Dep. at 4-5, and there is no evidence that Riedl or any of the other Defendants knew of that test.  See Clemons Dep. at 36.  Hancock did not learn of the C-Dorm test until October 26, 2009, and he immediately informed Riedl.  See Hancock Dep. at 43-44, 46.  At Riedl's instruction, Hancock notified the proper authorities, and at their recommendation, the F-Dorm was promptly evacuated and tested for asbestos.  See id. at 50.  The RMC then followed the recommended measures to remedy the asbestos issue, and a few months later provided the affected inmates with chest x-rays.  Id. at 50-51, 59, 63.  In light of the foregoing, the Court finds no evidence from which a jury could conclude that any Defendant actually knew of the risk to the inmates, and disregarded that risk by conduct that was more than mere negligence.  Accordingly, Brown cannot show that any

Defendant acted with deliberate indifference, and his claim fails on this basis as well.  In light of the foregoing, the Court concludes that the Motion is due to be granted as to all Defendants on Count I of the Amended Complaint.

**B.    Supervisory Liability**

In Count II of the Amended Complaint, Brown asserts a claim against Riedl premised on supervisory liability.  "[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."  Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotations and citations omitted).  "Instead, supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional violation."  Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003); see also Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010).  To establish the requisite causal connection, a plaintiff must allege "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."  Keating, 598 F.3d at 762 (quoting Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003)).  This requisite causal connection may be established "'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so,' . . . or when the supervisor's improper 'custom or policy . . . resulted in deliberate indifference to constitutional rights.'"  Gonzalez, 325 F.3d at 1234 (quoting Braddy v. Fla. Dep't of Labor and Emp't Sec., 133 F.3d 797, 802 (11th Cir. 1998); Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991)).  "The deprivations that constitute widespread abuse sufficient to

notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." <u>Brown v. Crawford</u>, 906 F.2d 667, 671 (11th Cir. 1990). The necessary causal connection may also be demonstrated through "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." <u>Gonzalez</u>, 325 F.3d at 1235.

Here, the record is devoid of any evidence that Riedl was personally involved with the tile removal project, that he was aware of or directed any unlawful conduct, or that there was any history of "widespread abuses." Regardless, Brown's claim for supervisory liability must fail given his inability to establish the underlying constitutional violation. <u>See</u> <u>Moore</u>, 595 F. App'x at 974; <u>Walker v. Huntsville, Ala.</u>, 310 F. App'x 335, 339 (11th Cir. 2009); <u>Campbell v. Sikes</u>, 169 F.3d 1353, 1374 (11th Cir. 1999). In light of the foregoing, Defendants' Motion is due to be granted as to Count II of the Complaint as well. Accordingly, it is

**ORDERED**:

1. Defendants' Motion for Summary Judgment (Doc. 114) is **GRANTED**.

2. The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendants Brian Riedl, in his individual and official capacities, Ellen Link, Christopher Hancock, Archie W. Clemons, and Officer Hartley, and against Plaintiff John Brown.

3.  The Clerk of the Court is further directed to terminate any remaining pending motions and deadlines as moot and close the file.

    **DONE AND ORDERED** in Jacksonville, Florida, this 25th day of March, 2016.

                                MARCIA MORALES HOWARD
                                United States District Judge

lc11
Copies to:

Counsel of Record
Pro Se Parties